| | |
|---|---|
| Craig Bernard, | Case No. 17-cv-3853 (SRN/SER) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| St. Jude Medical S.C., Inc., | |
| Defendant. | |

James H. Kaster and Laura Farley, Nichols Kaster PLLP, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402 for Plaintiff.

JoLynn M. Markison, Briana Al Taqatqa, and Trevor C. Brown, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402 for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Defendant St. Jude Medical S.C., Inc., a medical device manufacturer, fired its most senior sales representative in the Birmingham, Alabama region, Plaintiff Craig Bernard, on September 6, 2016. Bernard claims that St. Jude did this because of his age and his ongoing health problems, or, at the least, because, prior to his termination, he accused St. Jude of discriminating against him on such grounds (which would then make his firing impermissible "retaliation"). Bernard subsequently filed a lawsuit against St. Jude in federal court, and alleged violations of (1) the Age Discrimination in Employment Act; (2) the Americans with Disabilities Act; and (3) the Minnesota Human Rights Act.

St. Jude now moves for summary judgment, arguing that, even when the evidence is viewed in the light most favorable to Bernard, a reasonable juror could only conclude that

St. Jude fired Bernard for legitimate business reasons, namely, because Bernard (an at-will employee) failed to adequately perform as either a sales person or a team leader in his final year of employment, and then failed to adhere to the "performance improvement plan" St. Jude gave him as a means to remedy those performance problems. Bernard vigorously opposes the motion, and contends that the facts underlying his claims raise genuine issues of material fact such that a jury, rather than this Court, must be the one to determine if St. Jude violated the law.

The Court agrees with St. Jude, and will accordingly enter judgment in its favor. The Court explains its reasoning below.

## I.  BACKGROUND

### A.  The Parties

Plaintiff Craig Bernard (hereinafter "Bernard") is a 62-year-old man who worked at St. Jude from August 20, 2003 (when he was 46 years old) to September 6, 2016 (when he was 59 years old). (*See* Bernard Dep. [Doc. No. 38-2] at 24, 113; *see also* Defs.' An. [Doc. No. 8] ¶ 6 (providing birth date).) Bernard primarily worked in Birmingham, Alabama, and continues to reside there to this day. (*See* Bernard Dep. at 11-12.) Notably, in March 2005, during his time working for St. Jude, Bernard was diagnosed with "Chronic Lymphocytic Leukemia." (*See* Pl.'s Responses to Def.'s Interrogatories [Doc. No. 58-1] at 10.) Although the cancer has been in "remission" for years (because of chemotherapy Bernard received in 2008), Bernard still feels the effect of this diagnosis, particularly in his (weakened) immune system. (*See generally id*. at 9-12.)

Defendant St. Jude Medical S.C., Inc. (hereinafter "St. Jude") is a Minnesota-based medical device company. (*See* An. ¶ 2.) More specifically, St. Jude "develops, manufactures, sells, and provides clinical support for . . . medical devices," which in turn assist "cardiac, neurological, and chronic pain patients." (Kieck Dec. [Doc. No. 36] ¶ 2.)

## B. Factual Background

### 1. *Bernard Works as a Sales Representative at St. Jude from August 2003 through January 2015, When He Is Promoted to Territory Manager*

In broad strokes, Bernard's employment history with St. Jude went as follows. On August 20, 2003, St. Jude hired Bernard as a "direct sales representative," based in Gulfport, Mississippi. (*See* August 20, 2003 Offer of Employment [Doc. No. 38-1].) In April 2005, St. Jude transferred Bernard to Birmingham, Alabama, where he continued to work as a direct sales representative. (*See* Bernard Dep. at 26; *accord* Def.'s Answers to Pl.'s Interrogatories [Doc. No. 58-4] at 5.) In July 2007, St. Jude promoted Bernard to "senior sales consultant." (*See* Bernard Dep. at 62; *accord* Def.'s Answers to Pl.'s Interrogatories at 5.) And, as will be explored in more detail below, in January 2015, St. Jude again promoted Bernard, this time to be one of two "territory managers" for the Birmingham region. (*See* Bernard Dep. at 61; *accord* Def.'s Answers to Pl.'s Interrogatories at 5; Bernard Territory Manager Contract [Doc. No. 38-5].) Bernard was a "territory manager" until his termination on September 6, 2016.

During his years at St. Jude, Bernard's primary responsibility was to manage certain hospital "accounts" in his region, and then sell "cardiac rhythm management" ("CRM") devices, *i.e.*, pacemakers and defibrillators, to physician "clients" working at

those accounts. (*See* Bernard Dep. at 159-61.) While working in Birmingham, for instance, Bernard focused almost exclusively on generating CRM sales (and, in turn, earning commissions) at the following four "accounts": (1) University of Alabama in Birmingham Medical Center ("UAB"); (2) Brookwood Medical Center; (3) Grandview Medical Center (called Trinity Medical Center until July 2015); and (4) the VA Medical Center. (*See* Pl.'s Responses to Def.'s Interrogatories at 16; Bernard Dep. at 162; *see also* Bernard Employment Contracts [Doc. Nos. 38-3 to 38-4] (stating that Bernard's income was to be based on "commissions" and "bonuses," in addition to a base salary).)

Importantly, however, Bernard did not work as an independent salesperson. Rather, he, like many employees of large corporations, worked within a larger "team" structure, with co-workers situated both "below" and "above" him. On the one end of this spectrum, Bernard was responsible for supervising two to three "technical support specialists," or "TSSs." (*See* Bernard Dep. at 126.) Although TSSs differ somewhat from sales representatives, in that they focus on installing and maintaining CRM devices, rather than on "building and maintaining and managing" accounts and client relationships (*see id.* at 105), at least in Bernard's case, the line between sales representative and TSS sometimes blurred, which meant that Bernard had to work closely with his TSSs to ensure that everyone functioned well together. (*See, e.g.*, Mouron Dep. [Doc. No. 38-12] at 18-19, 35 (describing the "daily" communications Bernard's TSSs had with each other, as well as with Bernard himself).) On the other end of the spectrum, Bernard also worked under various managers, to ensure that he was meeting his sales goals and fulfilling the company's mission. Specifically, Bernard worked under a "regional sales director," who

in turn worked under an "area vice president," who in turn worked under a "divisional vice president." (*See* Bernard Dep. at 29-40.)

With that general background in mind, the Court will now turn to the specific facts underlying this litigation. With respect to the "August 2003 to January 2015" time period, the following three facts are most worth noting.

*First*, during this time period, Bernard was a highly successful salesperson. For instance, Bernard's "regional sales director" from 2006 to 2015, James Brennan, testified that Bernard's "sales performance was always at a high level or consistently at a high level." (Brennan Dep. [Doc. No. 38-37] at 87.) Brennan also testified that, as a general matter, he had a "a high level of respect" "for the way [Bernard] built a business" in Birmingham. (*Id*. at 91.) Indeed, in late 2014, St. Jude commended Bernard for being one of the company's highest-performing CRM salespersons in the entire southern United States. (*See generally* CRM November 2014 Sales Excellence Awards Program [Doc. No. 60].)

*Second*, despite Bernard's sales success during this time period, some of Bernard's colleagues were dissatisfied with Bernard's approach to leadership and communication. For instance, Brennan testified, as early as "2007/2008," Bernard began to develop "a pattern of challenging relationships with his support staff," *i.e.*, his TSSs, in large part because of Bernard's "very direct, demanding, and sometimes . . . abrasive[]" "communication style." (Brennan Dep. at 37-40.) In particular, Brennan recalled, two TSSs made comments about "interpersonal challenges" with Bernard when they left their

positions. (*Id*. at 39, 67-68; *but cf.* Bernard Dep. at 125 (stating that he "did not know" if either of those individuals left because "they wanted to be off [his] team").)

*Third*, although St. Jude did promote Bernard to "territory manager" in January 2015, this promotion proved somewhat controversial. This was so because, only a month prior to Bernard's promotion, Bernard's direct supervisors (Brennan and John Caldwell, the "area vice president" at the time) promoted St. Jude's *other* Birmingham "sales representative," Brian Faulknier, to the position of Birmingham "territory manager." (*See* Brennan Dep. at 78.)[1] Moreover, Brennan and Caldwell promoted Faulknier after considering (and then rejecting) Bernard's candidacy for that same position, which "greatly disappointed" Bernard. (*See id*. at 77-79.) However, due to pressure from Brennan and Caldwell's boss, the then-"divisional vice president," Jeff Powell, Brennan and Caldwell quickly promoted Bernard to "territory manager" as well. (*See id*. at 77.) In other words, although Brennan personally believed that St. Jude needed just "one territory manager in Birmingham," *i.e.*, Faulknier, he nonetheless promoted Bernard "because [he] was directed to do so" by Powell. (*Id.*)

This decision resulted in a somewhat awkward preservation of the status quo. That is, although Bernard and Faulknier were both now "territory managers" (and hence earning larger salaries and holding somewhat greater leadership responsibilities), they essentially continued doing what they had been doing previously: acting as sales representatives for their specific accounts in Birmingham, and then managing a team of

---

[1] As best the Court can tell, Bernard and Faulknier were the only two St. Jude "sales representatives" working in the Birmingham area in early 2015.

TSSs beneath them. (*See, e.g.*, Mouron Dep. at 68 (describing the new "territory managers" in Birmingham as "more like" "glorified sales reps").)

This situation proved challenging for all parties. On the one hand, Faulknier, like Brennan, believed that it was "counterproductive" for St. Jude to employ two territory managers in Birmingham, on grounds that it led to "two sales teams somewhat competing against each other in this geography working for the same organization." (Faulknier Dep. [Doc. No. 58-2] at 40.) Moreover, Faulknier thought, Bernard's (allegedly subpar) teamwork skills made the duel leadership model particularly "counterproductive." (*See, e.g.*, Faulknier Dep. at 105 (stating that, in his view, Bernard "belittle[d] people" and engaged in "narcissistic behavior").)

On the other hand, Bernard felt frustrated because he had been asking for more support staff for months, and this "preservation of the status quo" did not result in that favorable allocation of resources. (*See, e.g.*, Bernard Dep. at 83, 93, 123-24 (describing how the "other team in town," *i.e.*, Faulknier's team, consistently received more staffing resources than his team, especially after 2013).) Bernard was also frustrated because he believed that St. Jude's (alleged) preference for Faulknier stemmed from Faulknier's (presumably younger) age and (presumably better) health. (*See, e.g.*, Bernard Dep. at 93-94.)[2]

---

[2]    The Court uses the parenthetical "presumably" because it is not certain what Faulknier's age (or health status) was during the relevant time period. That is, although Bernard repeatedly asserts in his briefing that Faulknier was "under 40 years old" and "healthy" at all relevant times (*see, e.g.*, Pl.'s Br. in Opp. to Summ. J. [Doc. No. 56] ("Pl.'s Opp. Br") at 40), the Court can find no non-speculative evidence of Faulknier's age (or health) in the record. (*Cf.* Kieck Dep. [Doc. No. 39] at 33 (speculating that

## 2. *Bernard Faces a Variety of Work and Health-Related Challenges During His Time as Territory Manager*

The year and a half following this promotion was marked by a series of increasingly negative events for Bernard, on both a personal and professional level.

For starters, approximately six months after Bernard's promotion, in July 2015, Greg Kieck, a St. Jude employee in his late 30s, replaced Brennan as Bernard's "regional sales director." (Kieck Dep. at 10; *see also id*. at 15 (Kieck's age).) Although Kieck claimed to initially view Bernard with a "clean slate," Kieck testified at his deposition that, after a few months on the job, he came to believe that Bernard's team was "dysfunctional," and that "some of these dysfunctions within [Bernard's] team had been going on for a long period of time." (*Id*. at 13-14, 17.) Kieck apparently gleaned this negative perspective of Bernard from Brennan and Faulknier, as well as from conversations with "competitors" and "customers." (*Id*. at 13-14, 60-61.) Moreover, in a September, 28 2015 e-mail Kieck received from Ben Royster (who had replaced Caldwell as area vice president), Royster referred to Bernard as someone who was (allegedly) using his "territory manager" position to "line [his] pockets" and "assert [his] control over others." (Sept. 28, 2015 E-mail from Royster to Kieck et al [Doc. No. 58-3].)

That said, it is unclear how strongly Kieck held this belief at the time. Most notably, despite apparently receiving these negative assessments of Bernard throughout

Faulknier "was somewhere – or is somewhere – between 40 and 50").) However, because St. Jude has not attempted to refute Bernard's characterizations of Faulknier, the Court will accept them as true for purposes of this motion.

the second half of the 2015 year, on March 14, 2016, Kieck gave Bernard a "meets expectations," or "3/5," performance evaluation for the year, and did not mention any "dysfunction" on Bernard's team in the evaluation. (*See* Mar. 14, 2016 Performance Evaluation for 2015 Year [Doc. No. 58-5].)

Regardless of Kieck's feelings about Bernard, though, it is undisputed that Bernard did not enjoy working under Kieck. Not only did Bernard find that he and Kieck had "differences of opinions" on critical business issues (*see* Bernard Dep. at 34), but he also did not like that Kieck "rarely reached out regarding [Bernard's] performance, day-to-day activities, or about big-picture strategy at [St. Jude]." (Bernard Dec. [Doc. No. 57] ¶ 4; *compare with* Bernard Dep. at 31 (describing his "working relationship" with Brennan as "very good").)

Apart from these interpersonal tensions, Bernard's CRM sales declined significantly in 2015, as well as in the first quarter of 2016, which Kieck noted in various e-mails to Bernard. (*See* Jan. 14, 2016 E-mail from Pai to Kieck [Doc. No. 65-1] (showing an 18% decline in Bernard's sales from 2014 to 2015); Apr. 19, 2016 E-mail from Kieck to Bernard [Doc. No. 43] (highlighting further sales decline in Bernard's accounts for "Q1 2016," and noting that "Brookwood Medical Center," one of Bernard's most important accounts, was "one of the region's top decliners"); *accord* Bernard Dep. at 182-83 (acknowledging that these numbers are accurate).)

It is not clear why this decline occurred. There is some evidence that Bernard's sale drops stemmed from competitive pressures that St. Jude was experiencing nationwide. (*See, e.g.*, Faulknier Dep. at 107-09 (discussing "competitive" new "MRI-

safe pacemakers" introduced by Medtronic and Boston Scientific in "2012, 2013," and how those devices caused St. Jude to see "losses in their pacemaker sales numbers worldwide"); Mouron Dep. at 60-61 (same).) However, there is other evidence that, competitive headwinds notwithstanding, Bernard's sales were particularly lackluster. (*See, e.g.*, Jan. 14, 2016 E-mail from Pai to Kieck (showing that Faulknier *boosted* his sales by 8% from 2014 to 2015, in contrast to Bernard's 18% decline); Apr. 19, 2016 E-mail from Kieck to Bernard (pointing out that "Brookwood seems to be declining faster than other accounts and there are actually many accounts where the business is growing despite these same challenges").)

Ostensibly because of these declining sales, in February 2016 Bernard's supervisors (*i.e.*, Kieck and Royster) unilaterally re-hired and then promoted one of Bernard's former TSSs, a (younger) woman named Rachelle Mouron, to serve as a "direct sales representative" alongside Bernard. (*See* Mouron Dep. at 48-51.)[3] Most importantly, to accommodate Mouron's promotion, St. Jude required Bernard to give Mouron half of all future sales commissions generated at the UAB Medical Center account; until this point, Bernard had been allowed to keep 100% of sales commissions generated at this account. (*See* Kieck Dep. at 103-04; Bernard Dep. at 95-96.)

When Bernard learned of this arrangement, at a February 12, 2016 lunch meeting between him, Kieck, and Mouron, he openly expressed displeasure at Kieck and

---

[3]     Mouron, who was then in her early 30s, had initially "retired" from St. Jude in November 2015 so that she could care for her young child. (*See* Mouron Dep. at 46-47; Bernard Dep. at 55-56.)

Royster's decision, on grounds that it removed one of his key sources of commissions "overnight." (*See* Bernard Dep. at 186-87 (admitting that, although he was "very welcoming" to Mouron, he was "not happy about how" this decision was made); *cf.* Mouron Dep. at 95-98 (stating that Bernard was "not a happy camper" at this lunch meeting, and that he "made [her] feel as if . . . [she] was taking money out of his pocket," which "felt" "kind of disrespectful," given their "good relationship" in the past).)

Kieck testified that he and Royster promoted Mouron because she was an experienced, highly competent employee who had worked in the UAB account for years, and was therefore well positioned to "turn the account around." (*See* Kieck Dep. at 106; *accord* Dec. 15, 2015 E-mail from Kieck to Royster and Powell [Doc. No. 41] (contemporaneously describing Mouron's hire as a "bold move to change the perception of [St. Jude] in the Birmingham market," and noting that she could "drive growth at UAB"); *see also* Bernard Dep. at 46, 245 (conceding that Mouron was "top flight," a "great talent," and "one of [his] best hires [as a TSS]").) Indeed, it is generally not disputed that Mouron had done a significant amount of the UAB account work over her years working for Bernard yet had not received any sales commissions for her efforts. (*See* Mouron Dep. at 127, 183-84 (stating that she was doing "90 to 95 percent of the work at UAB," even when she was just a TSS); Kieck Dep. at 104-05 (same); *cf.* Bernard Dep. at 104-05 (conceding that Mouron had been doing "75 to 80 percent of the day-to-day" work at UAB prior to her promotion, but adding that this did not account for the interpersonal work of "maintaining and managing" relationships with key physician-clients).)

Moreover, Kieck and Royster apparently thought, handing some of Bernard's sales responsibility over to Mouron might help facilitate Bernard's transition into a "less stressful" "consulting" role, which Bernard had expressed interest in in late 2015 and early 2016. (*See, e.g.*, Feb. 18, 2016 E-mail from Royster to Wilson [Doc. No. 38-7] (contemporaneously discussing this "Bernard consulting agreement" and "transition"); Dec. 16, 2015 E-mail from Kieck to Royster and Powell (same); *accord* Bernard Dep. at 286-88 (conceding that, in January and February 2016, he discussed with Powell (the divisional vice president) the possibility of receiving a "standard practice" "consulting agreement," similar to what other senior employees had received in the past).)

In Bernard's view, however, regardless of any interest he had expressed in a transitory "consulting agreement," and regardless of Mouron's sales acumen, Kieck and Royster's decision to unilaterally give Mouron half of his sales commissions at UAB – one of his "top" accounts (Bernard Dep. at 162) – constituted blatant discrimination against a senior employee. (*See, e.g.*, Bernard Dep. at 98-101, 302.) Indeed, Bernard viewed this particular employment decision as part of the same "systematic" campaign to "undermine him" that had allegedly been in place since the time of the "Faulknier promotion," discussed *supra*. (*Id.*)

Bernard points to a few pieces of evidence in support of this contention. *First*, with respect to age discrimination, in October 2015, Royster allegedly told Bernard, in the context of Bernard inquiring about other employment options, "it's time to step aside

and let the younger folks have a chance." (*Id*. at 116.)[4] *Second*, also in October 2015, Kieck sent St. Jude's human resources department a "territory manager evaluation e-mail," in which Kieck compared Bernard and Faulknier, and concluded that, although Faulknier (a younger employee) was on a "regional sales director" track, Bernard was simply on a "sr. sales rep [track]." (*See* Oct. 5, 2015 E-mail from Kieck to Comazzi [Doc. No. 61].) *Third*, with respect to disability, or "health," discrimination, the Mouron promotion occurred only two months after Bernard "underwent surgery" to remove a "non-cancerous tumor," which Royster and Kieck both allegedly knew about. (*See* Bernard Dec. [Doc. No. 57] ¶ 6.)[5] *Fourth*, as a general piece of "suspicious" circumstantial evidence, Kieck and Royster never included Bernard in Mouron's re-hiring process, and even appeared to actively avoid discussing the issue with Bernard, despite the fact that Mouron was ostensibly joining "Bernard's team" in Birmingham. (*See, e.g.*, Jan. 20, 2016 E-mail from Bernard to Kieck [Doc. No. 58-15] (discussing his frustration that a new "sales representative" position was being created in Birmingham without his knowledge).) And, *fifth*, as another piece of general circumstantial evidence, this promotion occurred at the same time Bernard was transitioning from a "term contract" to an "at-will contract," and thus suggested that Kieck and Royster were intending to replace Bernard with Mouron, rather than use her as a supplement to him.

---

[4]    As a point of context, the Court notes that, during this time period, Royster was apparently somewhere in his late 50s or early 60s. (*See* Defs.' Reply Br. [Doc. No. 64] at 13 (asserting that "Royster is *older than* [Bernard]").)

[5]    It is not clear if this December 2015 surgery was connected to Bernard's prior leukemia diagnosis. (*See supra* at 2 (discussing Bernard's health history).)

(*See* Bernard Dep. at 95-96; *see also* Bernard March 3, 2014 Employment Agreement [Doc. No. 38-4] (showing that Bernard's "term of years" contract, which protected his commissions as a matter of contractual right, expired on February 17, 2016).)

Regardless of the motivation behind Mouron's February 2016 promotion, though, it is undisputed that, two months after Mouron's return to St. Jude, Mouron and Todd Crawford (one of the two TSSs then working beneath Bernard) both e-mailed Kieck to discuss their frustrations with Bernard's communication and leadership. First, in a lengthy e-mail sent to Kieck on April 3, 2016, Crawford described multiple instances in which Bernard "yelled [at] and berated" him and his colleagues (Mouron and Jason Posey, Bernard's other TSS), as well as other instances in which Bernard had failed to "follow through" on his work responsibilities. (*See* Apr. 3, 2016 E-mail from Crawford to Kieck [Doc. No. 38-9].) Because these "frustrat[ing]" experiences were (allegedly) "impact[ing] [Crawford's] quality of work and [making] [him] question [his] longevity with" St. Jude, at the end of his e-mail, Crawford requested that he be "realigned" to work solely under Mouron. (*Id.*)

Similarly, on April 12, 2016, Mouron sent Kieck a multi-paragraph e-mail explaining that "over the past few weeks," she had come to realize that the "longer this goes on," *i.e.*, the longer Bernard worked as a territory manager in Birmingham, "the more our team will decline." (Apr. 12, 2016 E-mail from Mouron to Kieck [Doc. No. 38-10].) Mouron then detailed specific instances of "poor communication" on Bernard's part, and criticized Bernard for his "irrational, controlling behavior that effects [*sic*] our

team." (*Id.*) She concluded by again emphasizing that "the accounts are on a steady decline and the longer this situation isn't dealt [with] the worst [*sic*] it will be." (*Id.*)[6]

Around the same time Kieck was learning about Mouron and Crawford's growing frustration with Bernard, Bernard was learning about medical treatment he needed to undergo in order to stabilize his immune system. (*See supra* at 2 (discussing Bernard's health background).) As such, on April 9, 2016, Bernard e-mailed Kieck, Mouron, Crawford, and Posey (his other TSS) and told them that, at the "recommendation of [his] oncologist," he was starting "immuno therapy" treatment "again," and that, accordingly, during the forthcoming months, he would need to take the occasional day off for treatment, *i.e.*, "once every four weeks for the next four to five months." (*See* April 9, 2016 Bernard E-mails to Team [Doc. Nos. 58-7 to 58-8].) Bernard then stated that he would take the entire next week of work off, *i.e.*, April 11-15, "in preparation for [his] first treatment." (*Id.*) However, Bernard added, he would still "be available by phone and email." (*Id.*)

Kieck quickly responded by expressing his condolences, and then stating, "let's talk when you have a minute next week so we can provide the resources needed to ensure everything is covered." (Apr. 9, 2016 E-mail from Kieck to Bernard [Doc. No. 58-8]; *see also* Kieck Dep. at 65 (stating that this e-mail marked the first time he learned about Bernard's history of leukemia).) Bernard concedes that St. Jude allowed him to take all

---

[6]     At his deposition, Bernard admitted that, as a general matter, "relationships were very contentious in Birmingham," "there was not a lot of trust among colleagues," and "nobody really knew what was going on or where we were going as a group and as a team and as a territory." (*Id.* at 137-38.)

the time off for his treatment that he requested, and that any work he did during this period of time arose out of his personal desire to assist his clients. (*See* Bernard Dep. at 79-84; *but cf. id*. at 81 (nonetheless arguing that, as a general matter, he did not feel that he ever received "enough coverage," in terms of TSSs, from management).)

However, it is undisputed that the tensions between Bernard, his supervisors, and his team did not recede in the weeks following this e-mail; in fact, they only accelerated. For one, when Kieck forwarded Bernard's April 9 e-mail to Royster, the two of them (Kieck and Royster) appeared to treat the requested accommodation as further evidence that Bernard might soon step down from his role. Specifically, Royster suggested that, because they had started "the process" of potentially moving Bernard to a different role (such as a consulting agreement) "prior to" Bernard's April 9 e-mail, "we may be ok." (Apr. 9, 2016 E-mails Between Royster and Kieck [Doc. No. 58-9].) However, Royster added, the question was "what morally should we do." (*Id*.) Kieck then responded that Bernard's poor health "may set up well for a move into a less stressful role." (*Id*.)

As for Bernard's team, Mouron testified that, because Bernard's "poor communication" habits continued to disrupt the team, even after the April 9 immuno therapy e-mail, she called Kieck at least once during the ensuing weeks to express further frustration about Bernard. For instance, at her deposition, Mouron recalled telling Kieck about one incident in "early May 2016," in which Bernard went on a "vacation" unrelated to his immuno therapy, but without telling her "when he was coming back," and without informing Posey or Crawford about his absence at all. (*See* Moron Dep. at 144-45; *but cf.* Bernard Dep. at 234-36 (stating that, although he didn't recall much "specifically" about

this incident, he talked to Mouron and Posey "extensively" about "coverage issues" during this post-April 9 time period).)

As such, immuno therapy treatment notwithstanding, in late April 2016 Kieck allegedly began drafting a formal "performance improvement plan," or "PIP," for Bernard, in hopes that it would help him "turn things around," in terms of both sales and team morale. (Kieck Dec. ¶ 10.)

### 3. *In early May of 2016, Bernard Formally Accuses St. Jude of Age and Disability-Based Discrimination*

Shortly thereafter, on May 5, 2016, Bernard had a meeting with Kieck, which Bernard had requested. At this meeting, Bernard "discussed [his] displeasure with [Kieck's] leadership and with the manipulation of [his] staff," and also stated "that [he] felt [he] was being discriminated against because of [his] health issues and [his] age and was being pushed out." (Bernard Dep. at 193-94.)[7] Bernard then relayed to Keick what he (Bernard) viewed as the "three possible options" for his future at St. Jude: (1) "a new [contract] that we all could live with," (2) "the negotiation of a mutually beneficial separation agreement," or (3) "we just simply part ways and the risks are what they are." (*See* May 25, 2016 Bernard E-mail to St. Jude HR [Doc. No. 38-18] (contemporaneously describing what he said to Kieck at this May 5 meeting); *accord* Bernard Dep. at 193 (confirming the accuracy of this contemporaneous e-mail).)

---

[7] It is not clear what "staff manipulation" Bernard was referring to during this May 5 meeting. However, in accusing St. Jude of age and disability discrimination, at the time, Bernard appeared to rely largely on management's (allegedly superior) treatment of Mouron and Faulknier, in comparison to him. (*See, e.g.*, Bernard Dep. at 117-18.)

For his part, Kieck adamantly denies that Bernard raised any discrimination complaints to him at this May 5 meeting. (*See* Kieck Dep. at 75; Kieck Dec. ¶¶ 11, 13.) Rather, Kieck claims, at this meeting, he (Kieck) re-iterated the ongoing concerns he had with Bernard about leadership and declining sales numbers. (Kieck Dec. ¶ 11.) Then, Kieck recalls, Bernard responded with his three-part "ultimatum." (*Id*.) Kieck and Bernard's memory of this tripartite "ultimatum" roughly accord; however, in Kieck's telling, Bernard phrased his "three options" in the following, more demanding, manner: (1) "relocate [Bernard] to a different territory," (2) grant Bernard a consulting agreement for an "ungodly amount of money," or (3) do nothing, which would lead Bernard to sue the company and then "burn the city down on his way out." (*Id*.) To Kieck, this meeting "solidified" his (allegedly pre-existing) desire to place Bernard on a PIP. (*Id*.)

A few days later, on May 9, 2016, after receiving more calls from Bernard's team members complaining about Bernard's behavior (*see id*. ¶ 12), Kieck sent Bernard an e-mail admonishing him for his (allegedly "disrespectful") conduct at the May 5 meeting, as well as for his "consistent lack of communication and coordination of efforts within [his] team." (May 9, 2016 E-mail from Kieck to Bernard [Doc. No. 46].) In this e-mail, Kieck also noted that "we are not meeting sales objectives in your accounts." (*Id*.) Kieck concluded his message by requesting that Bernard meet with him and Royster on May 19, 2016 in Birmingham, "to further discuss this current situation." (*Id*.; *see also* Kieck Dec. ¶ 12 (explaining that when he wrote "further discuss this current situation" he meant "present Bernard with a PIP").)

On May 14, 2016, Bernard responded to Kieck's e-mail with a lengthy e-mail of his own, and cc'ed both Royster and Chris Baier (who was the new divisional vice president). At the outset, Bernard declared Kieck's May 9 missive "factually wrong," and then proceeded to explain why he believed he had done a good job in terms of "planning, preparation, communication, and team support," even after his immuno therapy treatment began, and why legitimate business reasons explained his declining sales. (*See* May 14, 2016 E-mail from Bernard to Kieck [Doc. No. 45]; *see also supra* at 9-10 (detailing some of those legitimate business reasons).) Bernard also brought up his longstanding issues with the Mouron promotion, with Kieck's managerial approach, and with the Faulknier team, *i.e.*, the "other, younger team in town," receiving more resources than his team. (*Id.*) Bernard then stated that "clearly there is a move afoot to push [him] out," because he is a "well compensated 59-year old with health challenges." (*Id.*) In fact, in his next sentence, Bernard put the issue even more bluntly: "Clearly there is some age and health related discrimination issues here, and, now, based on the inaccurate statements in your email, some steps toward retaliation for bringing them to your attention." (*Id.*) Bernard then concluded his e-mail with the following paragraph:

> Gentleman [*sic*] we have been dancing around this for months. I get it, if you want to move in another direction, that's your prerogative as leadership, but let's do it with some honesty, integrity, and honor. I don't agree with the direction and don't think it is in the best interest of our business in Birmingham, but again this is your choice. If you want me out of the picture in Birmingham, let's be adults about it and work toward some equitable resolution that is in the best interest of all, rather than continue down a path that assures no winners. Let me know guys, it's time to resolve this.
>
> (*Id.*)

Early the next morning, Kieck immediately wrote to Royster and Baier that

Bernard had not previously brought the issue of "age discrimination" "to [his] attention,"

nor had he "indirectly hear[d] about it from anyone else." (May 14, 2016 Management E-

mail Exchange [Doc. No. 54].) Kieck then confirmed that he and Royster would address

Bernard's comments in person at the previously planned May 19 Birmingham meeting.

(*Id.*)

In response, Royster first exclaimed, "I've seen this movie before." (*Id.*) Royster

then "categorially" asserted that "at no time was [Bernard's] age ever discussed in any

fashion" among the three supervisors. (*Id.*) Royster also noted that he was adding Lauren

Henson (an HR representative) to the e-mail chain so as to ensure "full disclosure &

transparency in dealing with our employees." (*Id.*)

Shortly after this exchange, Kieck spoke with Henson by phone, and they agreed

that, discrimination allegations notwithstanding, a PIP constituted an appropriate

response to Mouron and Crawford's complaints about Bernard's leadership, and to

Bernard's declining sales numbers. (*See* Henson Dep. [Doc. No. 48] at 90-95.) Thus, on

or around May 16, 2016, Kieck sent a PIP to Henson so that HR could approve it and

Royster and Kieck could present it. (*See* Kieck Dec. ¶ 13; *accord* Henson Dep. at 95,

156.) After Henson and a member of St. Jude's legal department reviewed the document

and made a few edits, they returned the PIP to Kieck. (*See id*. at 200-02.)

####    4.  *On May 19, 2016 St. Jude Places Bernard on a Performance*
####        *Improvement Plan ("PIP")*

On May 19, 2016 Kieck and Royster met Bernard at a Birmingham hotel conference room and presented him with the PIP. (*See* Bernard Dep. at 180.) As Kieck and Royster explained at the meeting, the document contained two parts: a factual section setting forth Bernard's allegedly inappropriate conduct during the preceding months, and a remedial section setting forth eight benchmarks Bernard needed to meet in order to avoid further disciplinary action, such as termination. (*See generally* Bernard PIP [Doc. No. 38-15].)

The factual section focused on the employee complaints Kieck had received about Bernard over the "past six months," most of which are recounted above (*see, e.g.*, *supra* at 8, 14-16), as well as on the "lack of respect and understanding" Bernard allegedly displayed during the February 16, 2016 Mouron promotion meeting and the May 5, 2016 "ultimatum" meeting. (*See* Bernard PIP at 1-2.) For example, the PIP described Bernard's behavior during the latter meeting as "bullying," and further stated that Bernard "consistently attempt[ed] to disrespect management to advance [his] own agenda." (*Id.*) The factual section also discussed Bernard's declining sales performance. (*Id.* at 2.)

For his part, Bernard conceded at his deposition that Mouron and Crawford had complained to Kieck about him, that his team had been "highly dysfunctional" during the months preceding the PIP, that the two at-issue meetings had occurred, and that his sales had been on the decline. (*See generally* Bernard Dep. at 182-96, 309.) However, Bernard adamantly rejected St. Jude's characterization of his behavior as "disrespectful," and further rejected the idea that his actions came anywhere close to warranting a PIP. (*Id.*;

*see also id.* at 312 (adding that he found the PIP "inappropriate" in light of all the work he had done to "build a significant business for St. Jude").)

Regardless of the accuracy of the PIP's factual allegations, though, it is undisputed that the second part of the PIP – the "remedial section" – contained "reasonable business expectations," and that Bernard "should have been able to meet" these expectations, even in light of his ongoing health issues. (*See* Bernard Dep. at 196-98 (conceding this point).) Specifically, the PIP requested that Bernard:

**(1)** Develop a territory business plan for [his] accounts and send to Kieck by June 3, 2016;

**(2)** Send Kieck the following two weekly reports, every week for the next 90 days: a Monday report listing planned sales activities for the week, and a Friday report summarizing sales discussions from the week;

**(3)** Schedule individual meetings with Mouron, Posey, and Crawford by June 3, 2016, and then send Kieck the dates and times for those meetings so that Kieck could attend, too;

**(4)** Complete three all-team meetings and send Kieck a summary of those meetings;

**(5)** Complete a Code of Conduct module;

**(6)** Discuss [his] business plan from step (1) with [his] team and have different individuals specifically aligned to contribute to each of the strategies;

**(7)** Work with Kieck to attend at least one leadership development class; and

**(8)** Maintain a positive attitude and level of professionalism throughout this plan, including by not discussing the PIP with other team members or customers.

(Bernard PIP at 2-3.)

The PIP concluded by asserting that, if Bernard did not complete these eight tasks in 90 days, *i.e.*, by August 19, 2016, or if "other unacceptable behavior occurred," "further disciplinary action may be taken, up to and including termination." (*Id*. at 3.)

On May 23, 2016, Kieck e-mailed the PIP to Bernard as a follow-up to the meeting, and further requested that Bernard sign and return the document by May 25 so

that they could "move forward with the improvement plan and next steps." (May 23, 2016 E-mail from Kieck to Bernard [Doc. No. 38-15].)

Bernard did not sign and return the PIP by May 25. Rather, Bernard first independently contacted HR, by both phone and e-mail, to request that a formal internal investigation be conducted into his claims of age and disability discrimination. (*See*, *e.g.*, May 25, 2016 E-mail from Bernard to Hawks and Bae [Doc. No. 38-18] (describing many of the same facts discussed in his May 14 e-mail, and further adding that he thought the PIP was "retaliatory").) HR acknowledged Bernard's request(s) (*see, e.g.*, May 20, 2016 E-mail from Hawks to Bernard [Doc. No. 38-13]), and accordingly began gathering documents and conducting interviews regarding Bernard's discrimination claims. (*See, e.g.*, May 26, 2016 Internal HR E-mails [Doc. No. 38-19].)

Later that same day (May 25, 2016), Bernard e-mailed Kieck and Royster, and stated that he "disagree[d] with most of the allegations" contained in the PIP, and saw them as "yet another retaliatory response to [his] attempts to address the ongoing issues." (May 25, 2016 E-mail from Bernard to Kieck and Royster [Doc. No. 38-17].) In this message, Bernard also told Kieck and Royster about his earlier inquiry to HR, and expressed hope that HR's "engagement" in the "process" would "affect a mutually positive resolution." (*Id*.) Bernard did not include a signed copy of the PIP in this e-mail, as Kieck had requested in his May 23 message.

Over a month later, on June 28, 2016, Bernard sent Kieck a signed copy of the PIP. (*See* June 28, 2016 E-mail from Bernard to Kieck and Henson [Doc. No. 38-31].) Bernard apologized for his delay, and then added that he had "been pretty sick for the last

few weeks and [had also] needed some time to get advice from an attorney before proceeding." (*Id*.) Because of this delay, in the copy of the PIP he attached to his e-mail, Bernard unilaterally changed several of the document's completion dates to be later than the ones Kieck and HR initially included. (*See id*. (showing that Bernard crossed out several of the dates listed in the PIP and wrote in dates approximately one month later).) However, ongoing illness notwithstanding, in this message, Bernard did not inform Kieck that he could not complete the remedial section by the original mid-to-late August deadline. (*See* Bernard Dep. at 197-98.)

### 5. *At Around the Same Time St. Jude Places Bernard on a PIP, Bernard Is Suspended from One of His Hospital Accounts*

To briefly go back one month, it also bears mentioning that, on May 19, 2016 (the morning of the PIP meeting), Bernard received the following e-mail from a woman named Jackie Wright, who oversaw "materials management" at Brookwood Medical Center.

> I have spoken to [my colleagues], we all feel that you have completely misled all of us to get your product in here when you are aware of our rules and completely disregarded everything that everyone told you. At this point in time, I'm going to say thank you for your 2 gifts of implants to our hospital and I will be revoking your access for 30 days. Next time this happens, you will lose all privileges to Brookwood.

> (May 19, 2016 E-mail from Wright to Bernard [Doc. No. 38-16].)

In other words, Wright informed Bernard, because of Bernard's (allegedly improper) sales tactics, Brookwood was suspending him from visiting the medical center for 30 days. (*See* Bernard Dep. at 248 (acknowledging that he was, in fact, "banned from Brookwood for 30 days").)

The details concerning this suspension are murky; the record does not even contain a clear explanation of what exactly Bernard was alleged to have done wrong. (*See, e.g.*, Bernard Dep. at 263 (generally asserting that he was "scape goat" in a "political battle" between "two competing physicians").) And, what's more, there is no evidence that Bernard's suspension damaged St. Jude's existing business with Brookwood in any way whatsoever. (*See* Bernard Dep. at 316; Kieck Dep. at 91-92.)

However, it is undisputed that, after learning of this suspension, Bernard decided to not tell his supervisors about it, on grounds that he "did not trust" Kieck. (Bernard Dep. at 254-61.) Accordingly, neither Kieck nor Royster nor anyone in St. Jude's upper management learned about Bernard's suspension until days after it happened, when Kieck heard about it from a different source. (*Id*; *accord* Kieck Dep. at 91.)

Bernard's failure to immediately inform management about this incident concerned Kieck, and, in Kieck's view, provided another example of Bernard's "continued lack of communication with leadership, with his teammates." (Kieck Dep. at 92.) In fact, Kieck found this incident especially concerning because Bernard concealed client information from "leadership" at a time when Bernard already knew he was "under a [PIP]." (*Id*.) Moreover, Kieck noted in a declaration filed alongside St. Jude's summary judgment motion, shortly after this incident, the CFO of Tenant (Brookwood's corporate parent) allegedly told Kieck that Bernard was "negatively affecting [St. Jude's] ability to drive higher share at [Brookwood]," and specifically cited the 30-day suspension, as well as other "negative feedback from Brookwood physicians about [Bernard's] behavior," in support of this assertion. (Kieck Dec. ¶ 15; *accord* Aug. 4, 2016 E-mail from Kieck to

Hawks and Henson [Doc. No. 38-36] (contemporaneously documenting this conversation).) Kieck found this "unsolicited client feedback" troubling, too. (*Id.*)

### 6. *On September 6, 2016 St. Jude Fires Bernard for "Performance-Related Reasons"*

By the end of the 90-day PIP period, *i.e.*, mid-to-late August 2016, all parties agree that Bernard had failed to complete most (if any) of the eight requirements delineated in the document's remedial section. Specifically, it is undisputed that **(1)** Bernard did not send Kieck a territory business plan; **(2)** Bernard only sent "some" of the required weekly reports to Kieck, and not until after his modified July 4, 2016 start date had passed; **(3)** although Bernard did meet with his three team members individually, he did not invite Kieck to the meetings, as required; **(4)** Bernard held one team meeting, despite being asked to hold three; **(5)** Bernard did not complete the required Code of Conduct module; **(6)** Bernard did not assign any of his team members to specific tasks delineated in his territory business plan (which he had not created in the first place); **(7)** Bernard did not attend a leadership development class, and did not contact Kieck to inquire about the class because he had been "under the impression that [Kieck] would schedule [it]"; and **(8)** although Bernard attested that he "got up every day and did the best [he] could," he also conceded that he "would not be surprised" if team members said he "did not have a positive attitude" during the PIP period.[8] (*See generally* Bernard Dep.

---

[8]       Moreover, on point (8), Mouron testified at her deposition that, although the PIP specifically instructed Bernard not to discuss the PIP with his employees or customers, Bernard "told [her] about his PIP," and then said, "if [you] repeat[] that [I] told [you] about the plan, [I] will deny it." (Mouron Dep. at 153-54; *cf.* Bernard Dep. at 204 (stating

at 199-204; Kieck Dec. ¶ 16; *accord* July 11, 2016 E-mail from Royster to Henson and Kieck [Doc. No. 58-19] (contemporaneously affirming that Bernard was "not adhering to his PIP," and had "ignored his PIP assignments").)

By the end of the PIP period, St. Jude's HR department had also completed its internal investigation of Bernard's discrimination allegations, and had concluded that the allegations were "unsubstantiated." (*See* Aug. 29, 2016 E-mail from Hawks to Bae [Doc. No. 38-30] (e-mail announcing conclusion of investigation).)

Shortly after the completion of this investigation, then, the relevant parties at St. Jude, *i.e.*, the legal department, the HR department, and Bernard's supervisors (Chris Johnson[9] and Kieck), unanimously concluded that Bernard should be terminated for performance-related reasons, namely, Bernard's failure to comply with the PIP, or otherwise remedy the problems discussed in the PIP, and the (post-PIP) Brookwood suspension incident. (*See* Henson Dep. at 212-223; Kieck Dep. at 92-97; *see also* Bernard PIP at 3 (stating that Bernard could be fired if he failed to adhere to the PIP or if "other unacceptable behavior occurred").)

Consequently, on September 6, 2016, Kieck and Henson met with Bernard in a Birmingham hotel conference room, and informed Bernard that St. Jude was terminating him for "performance-related issues." (Bernard Dep. at 113.) St. Jude did not hire a

---

that he "may have discussed" the PIP with "an employee," but adding that he did not do so with "customers").)

[9]     At some point in July or August of 2016, Chris Johnson replaced Royster as area vice president. (*See* Henson Dep. at 216.)

replacement territory manager for Bernard after he left, and instead divided up Bernard's four accounts between other St. Jude employees, including Mouron and Faulknier. (*See* Mouron Dep. at 118-23; Faulknier Dep. at 109-11; *accord* Bernard Dec. ¶ 11.)

### C. Procedural Background

Two days after his termination, on September 8, 2016, Bernard filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in Birmingham. (*See* Sept. 8, 2016 EEOC Charge [Doc. No. 38-32]; *accord Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006) (noting that, "before bringing [a discrimination] suit in federal court," "a plaintiff must first timely file an 'administrative charge' with the EEOC") (citing 42 U.S.C. § 2000e-5(e))).) In this charge, Bernard accused St. Jude of age discrimination, disability discrimination, and retaliation. On May 24, 2017, after investigating Bernard's claims and finding no evidence to "suggest a violation of" federal law, the Birmingham EEOC office sent Bernard a "right to sue" letter. (May 24, 2017 EEOC Letter [Doc. No. 38-33].) Accordingly, on August 21, 2017, Bernard filed the present lawsuit. (*See* Compl. [Doc. No. 1].)

Bernard's complaint contains the following seven claims: (1) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); (2) retaliation in violation of the ADEA; (3) disability discrimination in violation of the Americans with Disabilities Act ("ADA"); (4) retaliation in violation of the ADA; (5) age discrimination in violation of the Minnesota Human Rights Act ("MHRA"); (6) disability discrimination in violation of the MHRA; and (7) retaliation in violation of the MHRA.

Following over a year of discovery, St. Jude moved for summary judgment on all seven claims. The parties filed briefing on the matter, and, on April 19, 2019, the Court entertained oral argument. (*See* Def.'s Br. in Support of Summ. J. ("Defs.' Br.") [Doc. No. 52]; Pl.'s Br. in Opp. of Summ. J. ("Pl.'s Opp. Br.") [Doc. No. 56]; Defs.' Reply Br. [Doc. No. 64].)

## II.   DISCUSSION

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, and the Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, a party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, and must set forth specific facts in the record showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016)

### A.  Overarching Legal Framework

Because this dispute primarily centers around federal employment law, the Court begins by describing the (virtually identical) legal standards under which courts evaluate ADEA, ADA, and retaliation claims.

In relevant part, federal law prohibits employers from taking "adverse employment action" against an employee because the employee is "over 40 years old," because the employee has a "qualifying disability," or because the employee reported age-or-disability-based discrimination to their employer. *See* 29 U.S.C. §§ 623(a), 631(a) (age discrimination); 42 U.S.C. § 12112(a) (disability discrimination); 29 U.S.C. § 623(d) (retaliation for reporting age discrimination); 29 U.S.C. § 12203(a) (retaliation for reporting disability discrimination).

Generally speaking, "adverse employment action" is a "tangible change in working conditions that produces a material employment disadvantage," such as "termination, cut in pay or benefits, [or other] changes that affect an employee's future career prospects." *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007) (cleaned up). However, "[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Id.*[10]

Importantly, though, an adverse employment action is only actionable if it occurs within a certain time period before the employee files their initial "charge" of discrimination. *See* 29 U.S.C. § 626(d) (age discrimination and retaliation); 42 U.S.C. §§ 12117(a), 2000e-5(e)(1) (disability discrimination and retaliation). In states with their

---

[10] The standard for "adverse employment action" is somewhat less demanding in the context of retaliation claims. *See generally Benner v. St. Paul Public Schools*, --- F.3d ---, 2019 WL 1993793, at *19 (D. Minn. May 6, 2019) (discussing the distinction); *accord Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63-68 (2006). However, as explained below, the distinction is irrelevant for purposes of this case.

own EEOC-type agency, that time period is 300 days; in states *without* their own EEOC-type agency, though, that time period is only 180 days. *See, e.g.*, 42 U.S.C. § 2000e-5(e)(1). As the Supreme Court has observed, these "obviously short" deadlines exist "to encourage the prompt processing of all charges of employment discrimination." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

All of that said, if a plaintiff-employee shows that the defendant-employer took an "adverse employment action" against them within the actionable time frame, the plaintiff must then show the defendant did this *because of* their protected characteristic (or *because they engaged in* protected conduct). The plaintiff can meet this burden in one of two ways.

*First*, a plaintiff can submit "direct evidence" showing "a specific link between the alleged discriminatory [or retaliatory] animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Hutton v. Maynard*, 812 F.3d 679, 683 (8th Cir. 2016). Although the term "direct evidence" technically refers to the "causal strength of the proof," and not to whether the evidence is *per se* "direct" or "circumstantial," the Eighth Circuit has generally defined "direct evidence" as "comments or statements indicating discriminatory [or retaliatory] intent, where those comments are made by people with decision-making authority," "during the decisional process." *Id*. at 683-84 (cleaned up); *accord Aulick v. Skybridge Am., Inc.*, 860 F.3d 613, 620 (8th Cir. 2017) (emphasizing that "stray remarks in the workplace, statements by nondecisionmakers, [and] statements by decisionmakers unrelated to the decisional process, do *not* constitute

31

direct evidence" of discrimination, nor do "statements by decisionmakers that are facially and contextually neutral") (emphasis added) (cleaned up).

However, if the record contains no direct evidence of discrimination, as is often the case, the plaintiff may *also* prove discriminatory intent through the well-trodden "*McDonnell-Douglas* burden-shifting framework." *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this framework, which applies in functionally similar ways to each of the at-issue claims, the plaintiff must first prove a "prima facie" case of discrimination or retaliation. *See Aulick*, 860 F.3d at 621 (prima facie case of age discrimination); *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016) (prima facie case of disability discrimination); *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 972 (8th Cir. 2014) (prima facie case of retaliation).[11] If the plaintiff produces evidence supporting a prima facie case of discrimination (or retaliation), "[t]he burden then shifts to [the defendant] to articulate a legitimate, nondiscriminatory reason for its actions," such as "performance-

---

[11] Specifically, a plaintiff can prove a prima facie case of age discrimination by showing that he, "(1) was at least 40 years old; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was [replaced with] someone sufficiently younger to permit the inference of age discrimination." *Aulick*, 860 F.3d at 621. Similarly, a plaintiff can prove a prima facie case of disability discrimination by showing, "(1) a qualifying disability; (2) qualifications to perform the essential functions of her position with or without reasonable accommodation; and (3) an adverse employment action due to her disability." *Kelleher*, 817 F.3d at 631. And, finally, a plaintiff can prove a prima facie case of retaliation by showing that, "(1) [he] engaged in a statutorily protected activity [*e.g.*, complaining about age-or-disability-related discrimination to his supervisor], (2) the employer took an adverse action against [him], and (3) there was a causal connection between the adverse action and the protected activity." *Prod. Fabricators*, 763 F.3d at 972.

related concerns." *Fiero*, 759 F.3d at 878. If the defendant meets that "minimal burden," the plaintiff must, in turn, "show that the proffered nondiscriminatory reason is merely a pretext for unlawful . . . discrimination." *Id*. (cleaned up). The plaintiff can demonstrate that a defendant's legitimate business reason was "pretextual" by, for example, showing that "other similarly situated individuals who were not in the plaintiff's protected class were treated differently," *Russell v. Kansas City, Mo.*, 414 F.3d 863, 868 (8th Cir. 2005), or that the "factual basis underlying the employer's proffered explanation . . . is unworthy of credence," *Fiero*, 759 F.3d at 878. However, because courts "do not sit as super-personnel departments," this "pretext" inquiry must focus solely on whether evidence in the record shows that a business's action against an employee "involve[d] intentional discrimination [or retaliation]," *not* on whether the business's action was "wise" or "fair" as a general matter. *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 955 (8th Cir. 2012) (cleaned up). In other words, "[w]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the Court's] province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Wilking v. Ramsey Cty.*, 153 F.3d 869, 873 (8th Cir. 1998).

### B. The Adverse Employment Action at Issue

As an initial matter, the parties dispute what "adverse employment action" is at issue in this case. Because resolving this dispute will help clarify the scope of Bernard's claims, the Court will start there.

In short, Bernard argues that he suffered three discrete, legally cognizable "adverse employment actions" during his time at St. Jude, and that he is accordingly

entitled to rest his discrimination lawsuit on each of these alleged wrongs: **(1)** the loss of UAB sales commissions that occurred when St. Jude re-hired Mouron in February 2016 and then promoted her to the position of "sales representative"; **(2)** St. Jude's placement of Bernard on a PIP on May 19, 2016; and **(3)** St. Jude's termination of Bernard's employment on September 6, 2016. (*See* Pl.'s Opp. Br. at 32-33.) For its part, St. Jude argues that **(1)** is not an actionable adverse employment action because it occurred more than 180 days before Bernard filed his charge of discrimination with the Birmingham EEOC, and that **(2)** is not an actionable adverse employment action because the Eighth Circuit generally does not consider PIPs to be adverse employment actions. (*See* Defs.' Reply Br. at 3-7.) St. Jude concedes, however, that **(3)** *is* adverse employment action. (*See id.* at 7.)

The Court agrees with St. Jude on both counts. ***First***, assuming without deciding that **(1)** is an adverse employment action, in the sense that Bernard's take-home pay appeared to decrease as a result of Mouron's promotion, *see Clegg*, 496 F.3d at 926 (noting that a "cut in pay" constitutes an "adverse employment action"), the applicable statute of limitations nonetheless bars Bernard from treating this incident as an individual legal wrong. In Alabama, where Bernard filed his original charge of discrimination, a plaintiff-employee must file a "charge of discrimination" with the local EEOC branch within 180 days of suffering a discriminatory adverse employment action. *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 421 F.3d 1169, 1178 (11th Cir. 2004) (explaining that, because Alabama is a "so-called" "non-deferral state," *i.e.*, it does not have an "EEOC-like state administrative agency," only "unlawful employment practices" that

"occurred within 180 days of the operative EEOC charge can form the basis for [federal anti-discrimination law] liability").[12] This time bar applies to *any* "discrete" "unlawful employment practice," including "termination, failure to promote, denial of transfer, or refusal to hire," *even when* the time-barred employment action is "related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113-14; *accord Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012) (per curiam) ("Each discrete act is a different unlawful employment practice for which a separate charge is required.").

There is no dispute that Mouron's February 2016 promotion (and Bernard's accordant decrease in pay) is a "discrete" discriminatory employment practice that occurred more than 180 days before Bernard filed his charge of discrimination. *Cf. Radcliffe v. Securian Fin. Grp.*, 906 F. Supp. 2d 874, 885 (D. Minn. 2012) ("Demotion constitutes a discrete, separate act."). As such, although the Court may undoubtedly consider the events surrounding the Mouron promotion to the extent they shed light on whether St. Jude discriminatorily terminated Bernard in September 2016, *see Morgan*, 536 U.S. at 113, the Court cannot treat the incident as a stand-alone "adverse employment action."[13]

---

[12] By contrast, in states that *do* have an "EEOC-like state administrative agency," such as Minnesota, a plaintiff can file their "charge of discrimination" within 300 days of suffering an allegedly unlawful employment practice. *See D.W. v. Radisson Plaza Hotel Rochester*, 958 F. Supp. 1368, 1373 (D. Minn. 1997).

[13] Because Bernard is not asserting a "hostile work environment" or "pattern and practice" discrimination claim, the "continuing course of conduct" law cited by Bernard is inapposite. *See Tadame v. St. Cloud State Univ.*, 328 F.3d 982, 987-89 (8th Cir. 2003).

**Second**, although **(2)** is not time-barred, it is also not, legally speaking, an "adverse employment action." The Eighth Circuit has squarely held that, even under the more lenient "retaliation" standard for "adverse employment action," *see supra* n.10, "placement on [a] PIP does not constitute an adverse employment action," *Fiero*, 759 F.3d at 880 n.2 (collecting citations). And, notably, this rule applies with particular force to PIPs that are "reasonable" and/or "minimally onerous." *See Payan v. UPS*, 905 F.3d 1162, 1173-74 (10th Cir. 2018) (holding that, because at-issue PIP required tasks that were neither "difficult" nor "especially time consuming," it was not "adverse employment action," and then citing substantial circuit court case law, including *Fiero*, in support of this conclusion); *cf. Fischer v. Andersen Corp.*, 483 F.3d 553, 557-58 (8th Cir. 2007) (holding that being placed on a PIP did not "amount to a constructive discharge" because no evidence showed that that the PIP was "setting [the plaintiff] up to fail" or was filled with "anything but reasonable" requirements).

Here, Bernard conceded that his PIP contained "reasonable business expectations," and that, accordingly, he "should have been able to meet the PIP's expectations." (*Supra* at 22.) Consequently, under both *Fiero* and the "minimally onerous" case law building upon *Fiero*, Bernard cannot treat his placement on a PIP as a stand-alone "adverse employment action" either.

## C. The Federal Law Claims

With the issue of adverse employment action resolved, the question now becomes whether a reasonable juror could find that St. Jude fired Bernard on September 6, 2016

because of his age or disability, or in retaliation for his internal complaints alleging age-and-disability-related discrimination. The Court will address each claim in turn.

### 1. *Age Discrimination*

The first question is whether Bernard has introduced any "direct evidence" of age discrimination. Bernard argues that he has, and, in particular, cites Royster's October 2015 comment to Bernard about "stepping aside and letting the younger folks have a chance," and Kieck's October 2015 internal e-mail suggesting that, while a younger employee (Faulknier) was on a "management track," Bernard was simply on a "senior sales representative track." (Pl.'s Opp. Br. at 37-38; *see also supra* at 12-13 (describing these comments in the context of the Mouron promotion).) However, this evidence does not constitute "direct evidence" of a discriminatory termination, at least as that term has been interpreted by the Eighth Circuit. Not only did Royster and Kieck make these comments outside the termination "decisional process," *see Aulick*, 860 F.3d at 620 (holding that "statements by decisionmakers unrelated to the decisional process do not constitute direct evidence" of discrimination), but the comments pre-dated Bernard's termination by approximately a year, and, hence, are best classified as "stray remarks," *see, e.g.*, *Bone*, 686 F.3d at 955 (holding that allegedly "ageist" and "racist" comments made "six months before [defendant] decided to discharge [plaintiff]" were "stray remarks" "unrelated to the decisional process" and were, therefore, not direct evidence of discrimination); *Ramlet v. E.F. Johnson*, 507 F.3d 1149, 1153 (8th Cir. 2007) (same).

The more salient question, then, is whether Bernard has pointed to *circumstantial* evidence showing that St. Jude fired him because of his age. The Court will assume

without deciding that Bernard has stated a prima facie case of age discrimination. *See Aulick*, 860 F.3d at 621 (approving this approach). And, because there is no dispute that St. Jude has "articulated" "legitimate, nondiscriminatory reasons for its actions," *see Fiero*, 759 F.3d at 878 (holding that "performance-related concerns" is a nondiscriminatory reason to fire an employee), the question thus becomes whether Bernard can "show that [St. Jude's] proffered nondiscriminatory reasons [were] merely a pretext for unlawful [age] discrimination," *id*. Bernard makes two primary arguments in favor of finding pretext here. ***First***, Bernard argues, St. Jude treated "similarly situated" younger employees, namely, Mouron and Faulknier, better than him in the lead-up to his termination. (*See* Pl.'s Opp. Br. at 39-40.) ***Second***, Bernard contends, his history of success at St. Jude shows that his termination was based on a "demonstrably false" premise of "performance problems." (*See id*. at 35.)

The Court finds neither argument availing. ***First***, general evidence that Kieck and Royster favored Mouron and Faulknier over Bernard does not show that the two employees were "similarly situated" to Bernard, and hence does not provide evidence of pretext. "At the pretext stage of the *McDonnell Douglas* burden-shifting framework," the "similarly situated" inquiry is a "rigorous one." *Fiero*, 759 F.3d at 879. "The individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing characteristics." *Bone*, 686 F.3d at 956. In other words, in the discriminatory termination context, the question is *not* whether the employer ever treated younger employees better than the older plaintiff, but, rather, whether specific younger

employees engaged in behavior analogous to the plaintiff, and yet were not terminated (or otherwise reprimanded) for that behavior.

*Bone* well illustrates the strictness of this inquiry. There, the Eighth Circuit held that, although young co-workers of the plaintiff engaged in forbidden conduct (just as the plaintiff had) and yet were not fired for that conduct (unlike the plaintiff), no reasonable juror could find that the young co-workers were "similarly situated" for pretext purposes simply because the plaintiff's forbidden conduct differed "in kind" from the allegedly similar workers' forbidden conduct. *See Bone*, 686 F.3d at 956 ("Plaintiff's resistance to [her employer's] directives and outright refusal to comply with [her supervisor's] request regarding [a] conference [was] different in kind from the [allegedly similar] workers' various disciplinary violations.").

Here, although Mouron and Faulknier both worked under the same supervisors as Bernard, *i.e.*, Kieck and Royster, there is no evidence that either employee "engaged in the same conduct" as Bernard did prior to his termination, much less "the same conduct without any mitigating or distinguishing characteristics." *Id*. More specifically, there is no evidence, either individually or collectively, (1) that other employees called and e-mailed management to complain about Mouron or Faulknier's leadership; (2) that Mouron or Faulknier's sales numbers declined over a year-and-a-half long period[14]; (3) that Mouron or Faulknier was suspended from a major sales account; (4) that Mouron or Faulknier declined to inform management about an event like an account suspension after

---

[14]    As the Court noted in passing above, Faulknier's sale numbers actually increased during the relevant time period. (*See supra* at 10.)

it happened; or (5) that Mouron or Faulknier failed to adhere to a PIP consisting solely of "reasonable business expectations."

Consequently, under Eighth Circuit precedent, no reasonable juror could infer from St. Jude's allegedly superior treatment of Mouron and Faulknier that St. Jude fired Bernard in September 2016 because of his age.

Bernard's *second* argument, that a reasonable juror could find that Bernard's firing was pretextual because it was based on the "demonstrably false" premise that Bernard had "performance problems," falls short, too. In making this argument, Bernard relies almost exclusively on two pieces of evidence: (1) Bernard's longstanding history of success at St. Jude, particularly in terms of sales, and (2) Kieck's March 16, 2016 performance evaluation of Bernard, in which Kieck gave Bernard a "3/5," "meets expectations" review, and did not make any mention of performance problems. (*See* Pl.'s Opp. Br. at 35-36.) This evidence is noteworthy. However, the problem for Bernard's case is that, although a reasonable juror could perhaps infer from this evidence that, as of *March* 2016, St. Jude did not actually find any of Bernard's alleged performance problems concerning (despite Kieck's claims to the contrary at his deposition), a reasonable juror could *not* draw that inference based on the undisputed evidence available to St. Jude by *September* of that year, when Bernard was terminated. Specifically, by September 6, 2016, St. Jude was aware of the following four performance-related issues with Bernard: **(a)** Bernard's sales had been steadily declining for over a year and a half, despite his earlier history of success, **(b)** two of Bernard's colleagues had actively complained to management about their displeasure with Bernard's leadership, **(c)**

40

Bernard had been suspended from one of his most important accounts and yet had not informed anyone in management about this incident at the time it happened, and, most crucially, **(d)** Bernard had not complied with a "reasonable" PIP in any substantial manner, despite being given the full three months to do so, and despite the PIP explicitly warning Bernard that failure to comply could result in his termination.

Bernard does not point to any evidence suggesting that these four, more recent "performance issues" were "demonstrably false," or otherwise indicative of a "pretext to age discriminate" on St. Jude's part. Accordingly, no reasonable juror could infer from Bernard's sales success in the years prior to 2015, or from a "meets expectations" performance review in March 2016, that "age discrimination," rather than "performance-related concerns," "truly was the reason for [Bernard's] termination" in September 2016. *Wilking*, 153 F.3d at 873.

The Eighth Circuit's decision in *Lewis v. St. Cloud State Univ.*, 467 F.3d 1133 (8th Cir. 2006), is instructive on this point. There, a university dean similarly pointed to a "positive annual performance review" he received a year prior to his termination as compelling evidence that the university's "stated reasons for demoting him [*i.e.*, that he was "ineffective" and "created a divisive environment"] should not be believed." *Id*. at 1137. The Eighth Circuit rejected this argument and affirmed the district court's grant of summary judgment. In so doing, the Eighth Circuit emphasized that the dean's "[positive] past reviews [did not] create[] an inference [of age discrimination] because the University's proffered reasons for his demotion were based on incidents that [the dean] did not dispute, some of which occurred after his previous supervisor evaluated him for

the last time." *Id.* at 1138; *see also Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 728-29 (8th Cir. 2001) (same, and observing that, in making a termination decision, "[a]n employer may choose to rely on recent performance more heavily than past performance").

Likewise here, evidence concerning Bernard's past success does not create an inference of age discrimination because the key "performance problems" upon which St. Jude based Bernard's termination are undisputed, and, indeed, "occurred *after* [Kieck] evaluated [Bernard] for the last time [in March 2016]." *Lewis*, 467 F.3d at 1138 (emphasis added). As such, on this record, no reasonable juror could find that, when St. Jude fired Bernard for "performance-related reasons," it was really trying to fire him because he was over the age of 40.

For these reasons, the Court grants St. Jude summary judgment with respect to Bernard's ADEA claim.

### 2. *Disability Discrimination*

In light of this ruling, the only question with respect to Bernard's disability discrimination claim is whether Bernard has pointed to evidence of "pretext" that distinguishes this claim from his prior, age-related discrimination claim.[15] Upon careful review of the record and briefing, the Court finds that Bernard makes only one argument

---

[15] The Court skips to the "pretext" step of analysis because, unlike his ADEA claim, Bernard does not point to any direct evidence of disability discrimination. Further, as it did above, the Court will assume that Bernard has stated a prima facie case of disability discrimination, and that St. Jude has articulated legitimate, non-discriminatory reasons for Bernard's termination in response.

about "pretext" that the Court did not address above. Namely, that, given the timing between Bernard's April 9, 2016 "immuno therapy" e-mail, St. Jude's placement of Bernard on the PIP in May, and St. Jude's eventual termination of Bernard in September, a reasonable juror could find that St. Jude "designed" Bernard's PIP "to last the entirety of" Bernard's immuno therapy treatment, *i.e.*, approximately three months, and could therefore infer that St. Jude fired Bernard, not for failing to complete his PIP, or for other performance-based reasons, but because he was ill. (Pl.'s Opp. Br. at 34.)

The Court again disagrees; no reasonable juror could draw that inference from this record. This is so for three reasons.

*First*, there is no evidence that St. Jude "designed" the PIP to be incompatible with Bernard's immuno therapy treatments. Not only did Bernard concede at his deposition that the PIP's eight requirements were reasonable, and that he "should have been able to" complete the eight requirements by mid-August 2016, but, despite exchanging multiple e-mails with management about the PIP at the time, Bernard did not once claim (or even suggest) that his immuno therapy prevented him from completing the PIP. This silence on Bernard's part matters because, in the ADA context, the burden is on the "disabled employee" to "alert [their] employer to the need for an accommodation." *Kelleher*, 817 F.3d at 632 n.6. Bernard did not "alert" St. Jude that he needed such an "accommodation" here. As such, he cannot now fault St. Jude for failing to take his disability into account when designing his PIP, or when making a termination decision based on Bernard's failure to complete that PIP.

43

*Second*, even if discriminatory animus could be inferred from the mere timing

between Bernard's April 9 e-mail and the placement of Bernard on a three-month PIP,

*but see Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 997-98 (8th Cir. 2014) (granting

employer summary judgment on ADA claim, and noting that "timing on its own is *not*

sufficient to show that an employer's non-discriminatory reason for an adverse

employment action is merely pretext"), this timing does not change the fact that, by

September 2016, Bernard had failed to complete the eight requirements outlined in his

PIP, and that this failure alone created a legitimate, non-discriminatory reason upon

which St. Jude could base its termination decision. This conclusion holds especially true

in light of other undisputed performance-related concerns that existed at the time of

Bernard's termination, namely, the ongoing decline in sales, the Mouron and Crawford

complaints, and the Brookwood suspension incident.

*Third*, as a general matter, the Court also finds it notable that, after Bernard was

diagnosed with leukemia in March 2005, St. Jude allowed him to take time off to pursue

chemotherapy (*see, e.g.*, Bernard Dep. at 80-81), and then promoted him twice in the

ensuing years, first to the position of "senior sales representative" in July 2007, and then

to the position of "territory manager" in January 2015 (albeit somewhat grudgingly the

second time, as recounted *supra* at 6-7). This evidence "creates a presumption against"

disability discrimination on St. Jude's part, in that it is "unlikely" that St. Jude would

spend the better part of a decade helping Bernard recover from his leukemia diagnosis,

only to then fire Bernard in September 2016 because of that same diagnosis (or, put

differently, because of ongoing complications arising out of that same diagnosis). *Cf.*

*Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 470 (8th Cir. 2011) (holding, in the age discrimination context, that "it is unlikely a supervisor would hire an older employee and then discriminate on the basis of age, and such evidence creates a presumption against discrimination").

Consequently, no reasonable juror could infer from this record that St. Jude fired Bernard in September 2016 because he was undergoing immuno therapy treatment, rather than because of genuinely held performance-related concerns.

For these reasons, the Court grants St. Jude summary judgment with respect to Bernard's ADA claim.

### 3. *Retaliation*

Finally, Bernard advances a retaliation claim that is premised on the same general allegations as his prior two discrimination claims. In short, Bernard argues that, because his complaints to Kieck on May 5 and May 14 constituted "protected conduct," under both the ADA and the ADEA, and because St. Jude (supposedly) "did not begin addressing [Bernard's] alleged [performance] deficiencies" until *after* Bernard engaged in such conduct (*but see* Kieck Dec. ¶ 10 (alleging that he began drafting a PIP for Bernard before the May 5 meeting)), a reasonable juror could infer that St. Jude terminated Bernard four months later, on September 6, 2016, *because* he engaged in that protected conduct. (Pl.'s Opp. Br. at 41-43.)

The Court disagrees on this count, too, for two reasons. *First*, Bernard fails to point to evidence from which a reasonable juror could find in his favor on the "causation element" of a prima facie retaliation claim. As the Court noted above, a plaintiff can

prove a prima facie case of retaliation by showing that, "(1) [he] engaged in a statutorily protected activity, (2) the employer took an adverse action against [him], and (3) there was a causal connection between the adverse action and the protected activity." *Prod. Fabricators*, 763 F.3d at 972. Under this third element, the causation element, a plaintiff must show that their protected activity constituted a "but-for cause of the alleged adverse action by the employer." *Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 919 (8th Cir. 2014). The Eighth Circuit has interpreted this requirement strictly, and has repeatedly held that, even if a "temporal connection" exists between a plaintiff engaging in protected activity and a defendant taking adverse action against that plaintiff, undisputed evidence about "intervening" negative conduct by the plaintiff will "erode any causal connection that was suggested by [that] temporal proximity," and will accordingly entitle the defendant-employer to summary judgment. *Kiel v. Selected Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999) (en banc) (affirming grant of summary judgment); *see also Musolf*, 773 F.3d at 919 (same); *Lenzen v. Workers Comp. Reinsurance Ass'n*, 705 F.3d 816, 821-22 (8th Cir. 2013) (same).

The facts of *Kiel* illustrate the strictness of this causation requirement. In that case, a deaf employee requested that his employer purchase him a special phone that would help him better conduct his business. *Kiel*, 169 F.3d at 1134. After his employer rejected this request, the plaintiff accused the employer of being "selfish" and then "slammed his desk drawer." *Id*. All of this occurred in front of the plaintiff's colleagues. *Id*. Although the plaintiff apologized later that day, the employer decided to immediately terminate the plaintiff for his supposedly "insubordinate" conduct. *Id*. On these facts, the Eighth Circuit

found that, although the employer terminated the plaintiff on the same day he engaged in protected conduct, *i.e.*, the day he requested a special phone, the "intervening" "negative conduct" by the plaintiff, *i.e.*, his "rude" response to the employer's denial of his request, meant that no reasonable juror could find that the employer fired the plaintiff "because of" his protected conduct. *Id*. at 1136.

This case is far easier than *Kiel*. Here, *numerous* negative "intervening" events occurred in the *months* between the at-issue May 5 meeting and Bernard's termination, most notably Bernard's failure to comply with his PIP in any substantial manner. (*See also supra* at 40-41 (describing other "intervening" events that occurred after May 5).) These events, accordingly, "erode[] any causal connection that was suggested by the temporal proximity of [Bernard's] protected conduct [on May 5 and May 14] and his termination [on September 6]." *Kiel*, 169 F.3d at 1136.

*Second*, even if a reasonable juror could find for Bernard on causation, Bernard has failed to meet his burden with respect to "pretext," too, for the reasons described above. (*See* Pl.'s Opp. Br. at 43 (relying on the same pretext arguments rejected *supra*).)

For these reasons, the Court grants St. Jude summary judgment with respect to Bernard's retaliation claims.

### D. The Minnesota State Law Claims

Although Bernard also asserts various state law discrimination claims under the MHRA, these claims fare no better than his federal law claims. Most importantly, the MHRA only applies to "employees" who "reside or work in" Minnesota. Minn. Stat. § 363A.03, subd. 15. However, it is undisputed that, at all relevant times, Bernard lived and

worked in Alabama, not Minnesota. (*See supra* at 2.) Accordingly, Bernard lacks standing to assert claims under the MHRA. *See, e.g.*, *Wilson v. CFMOTO Powersports, Inc.*, No. 15-cv-3192 (JRT/JJK), 2016 WL 912182, at *5 (D. Minn. Mar. 7, 2016) ("Courts have generally found, and this Court agrees, that a plaintiff must either reside or work in Minnesota to have standing to assert claims under the MHRA.").

For this reason, the Court grants St. Jude summary judgment with respect to Bernard's MHRA claims.[16]

## III.   CONCLUSION

The Court acknowledges that Bernard served St. Jude well for years, and that he did so while battling serious health complications. As such, St. Jude's decision to terminate Bernard might appropriately be described as unfair. However, as the Court emphasized above, the only relevant question for purposes of this motion is whether a reasonable juror could conclude, from this record, that St. Jude terminated Bernard on September 6, 2016 for an illegal reason; deciding whether St. Jude's treatment of Bernard was "wise" or "fair" lies outside this Court's "province." *Wilking*, 153 F.3d at 873. Consequently, because the record does not suggest that St. Jude acted illegally here, the law requires the Court to find in St. Jude's favor.

---

[16]     The Court also notes that, even if Bernard did have standing to assert claims under the MHRA, it would not affect the outcome of this case. This is so because Minnesota courts generally treat MHRA discrimination and retaliation claims identically to their federal law counterparts. *See, e.g.*, *Hustvet v. Allina Health Sys.*, 910 F.3d 399, 412 (8th Cir. 2018). Therefore, because the Court has found that St. Jude is entitled to summary judgment as to Bernard's federal law claims, the Court would be dutybound to find that St. Jude is entitled to summary judgment as to Bernard's MHRA claims, too.

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant St. Jude Medical's Motion for Summary Judgment [Doc. No. 34] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  July 10, 2019                                           s/Susan Richard Nelson
                                                                        SUSAN RICHARD NELSON
                                                                        United States District Judge